## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Albertson's LLC, The Great Atlantic & Pacific Tea Company, Inc. and HEB Grocery Company, LP, | Civil Action No: |
| Plaintiffs, | |
| vs. | |
| Cadbury Schweppes plc, Cadbury Adams USA LLC, Cadbury Adams Canada, Inc., The Hershey Company, Hershey Canada, Inc., Mars, Incorporated, Mars North America, Mars Snackfood US LLC and Nestle USA, | |
| Defendants. | |

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Albertson's LLC, The Great Atlantic & Pacific Tea Company, Inc. and HEB Grocery Company, LP (individually and collectively "Plaintiffs") sue Defendants Cadbury Schweppes plc, Cadbury Adams USA LLC, Cadbury Adams Canada, Inc., The Hershey Company, Hershey Canada, Inc., Mars, Incorporated, Mars North America, Mars Snackfood US LLC and Nestle USA (individually and collectively "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of a conspiracy among the world's leading manufacturers of chocolate candy products to fix, raise, maintain or stabilize prices of those products in the United States.  As alleged more fully below, early in the 2000s the chocolate candy business began to show signs of slowing, and the prospects for growth were dim.  By approximately 2002, in an effort to combat the prospects of diminishing profits, Defendants and their co-conspirators entered into a conspiracy not to compete in the sale of chocolate candy products.  As a direct and proximate result of Defendants' cartel activities, Defendants and their co-conspirators overcharged Plaintiffs

for chocolate candy products directly sold by Defendants and/or their co-conspirators to each Plaintiff.

2.      As alleged more fully below, Defendants and their co-conspirators fixed, raised, maintained or stabilized prices for chocolate candy products (as defined in this Complaint) directly sold in the United States and its territories beginning in 2002 and continuing until at least approximately 2008.

3.      Plaintiffs purchased chocolate candy products directly from Defendants during the Relevant Period, *i.e.*, from January 1, 2002 through the present, in the United States.

4.      As a result of Defendants' unlawful conduct, Plaintiffs have been injured in their businesses and property, including paying supracompetitive prices for chocolate candy products purchased from Defendants.  Plaintiffs therefore seek damages and injunctive relief.

5.      The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.

## JURISDICTION AND VENUE

6.      This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

7.      This Court has subject matter jurisdiction of each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this Court pursuant to 15 U.S.C. §§ 15 and 22, 28 U.S.C. § 1391(c) & (d), and 28 U.S.C. § 1407, because:

(a)      a substantial part of the events giving rise to these claims occurred in this District, including the sale at artificially high prices of chocolate candy products;

2

(b)     each Defendant is subject to personal jurisdiction in this District;

(c)     Defendants transact business or are found in this District, or in the case of the foreign Defendants, they transact business directly and/or through the activities of domestic subsidiaries and affiliates that each foreign Defendant dominates and controls within this District;

(d)     the April 7, 2008 Order of the Judicial Panel on Multidistrict Litigation directed that the actions be transferred to this District;

(e)     Defendants Cadbury Holdings Ltd. (formerly known as Cadbury Schweppes plc), Cadbury plc, Cadbury Adams Canada, Inc. and Hershey Canada, Inc. are legal aliens and may be sued in any District.

9.     Defendants are subject to the personal jurisdiction of this Court because they:

(a)     are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     are amenable to service of process because each inhabits, transacts business in, or is found in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling chocolate candy throughout the United States, including in this District;

(c)     are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling chocolate candy products to Plaintiffs and others in this District at artificially inflated prices;

(d)     are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of this Commonwealth because each Defendant

3

has transacted (and continues to transact) business in this Commonwealth, the Commonwealth's long-arm statute extends jurisdiction to the limits of due process, and each Defendant has sufficient minimum contacts with the Commonwealth to satisfy due process;

(e)    they and one or more of their co-conspirators contracted to supply services or goods, including chocolate candy products, or have agents who contracted to supply materials or goods, including chocolate candy products, in the Commonwealth; money flowed from Plaintiffs or other purchasers in the Commonwealth to pay Defendants and their co-conspirators for chocolate candy products; Defendants and one or more of their co-conspirators transact business in the Commonwealth or have agents who transact business on their behalf in the Commonwealth in furtherance of the conspiracy; Defendants and their co-conspirators committed unlawful acts  or caused one or more unlawful acts to be done, or consequences to occur, in the Commonwealth; or Defendants and their co-conspirators engaged in unlawful conduct described below outside of the Commonwealth causing injury to Plaintiffs in the Commonwealth.

## PARTIES

### Plaintiffs

10.    Plaintiff Albertson's LLC ("Albertson's") is a limited-liability company with its principal place of business in Boise, Idaho.  Albertson's owns and operates retail stores that sell chocolate candy products.  During the Relevant Period, Albertson's purchased chocolate candy products in the United States directly from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business or property by reason of the antitrust violations alleged in this Complaint.

11.    Plaintiff The Great Atlantic & Pacific Tea Company, Inc. ("A&P") is a Maryland corporation with its principal place of business in Montvale, New Jersey.  A&P brings this action on

behalf of itself and that portion of the claim which C&S Wholesale Grocers, Inc. has assigned to A&P.  The reference in this Complaint to "A&P" includes its assignors.  A&P owns and operates retail stores that sell chocolate candy products.  During the Relevant, Period, A&P purchased chocolate candy products in the United States directly from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business or property by reason of the antitrust violations alleged in this Complaint.

12.     Plaintiff HEB Grocery Company, LP ("HEB") is a Texas limited partnership with its principal place of business in San Antonio, Texas.  HEB owns and operates retail stores that sell chocolate candy products.  During the Relevant Period, HEB purchased chocolate candy products in the United States directly from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business or property by reason of the antitrust violations alleged herein.

13.     During the Relevant Period, Defendants and/or their co-conspirators each engaged in the anticompetitive conduct described in this Complaint with the intention that the conduct would have, and it did have, a substantial and reasonably foreseeable direct, proximate and adverse effect on the price of chocolate candy products sold to Plaintiffs and others in the United States.  That domestic effect gives rise to these claims.

## Defendants

**The Hershey Defendants**

14.     Defendant The Hershey Company ("Hershey Co.") is a Delaware corporation with its principal place of business at 100 Crystal A Drive, Hershey, Pennsylvania.  Hershey Co. is a public corporation with its shares traded on the New York Stock Exchange and, until April 2004, was known as Hershey Foods Corporation.  During the Relevant Period, the vast majority of Hershey

Co.'s consolidated revenues came from operations in North America.  During the Relevant Period, Hershey Co. manufactured, sold and/or distributed chocolate candy products, directly and/or through its predecessors, affiliated companies and/or subsidiaries, to purchasers throughout the United States and North America.

15.    Defendant Hershey Canada Inc. ("Hershey Canada") is a Canadian corporation with its principal place of business at Airport Corporate Centre, 5750 Explorer Drive, Suite 500, Mississauga, Ontario.   Hershey Canada is a wholly-owned subsidiary of Hershey Co. and manufactures, distributes and sells confectionary, snack, refreshment and grocery products in Canada.  During the Relevant Period, Hershey Canada manufactured and sold chocolate candy products to purchasers in Canada and the United States, directly or through its predecessors, affiliates and/or subsidiaries.

16.    Hershey Co. and Hershey Canada (together "Hershey") product lines are divided into chocolate candy and confectionary products; premium products; snack products; refreshment products (mints and chewing gum); and food and beverage enhancers (*i.e.*, toppings and syrups). Hershey has manufacturing plants in Pennsylvania, California, Illinois, Virginia and Smiths Falls, Ontario, with distribution centers in Illinois, California and Mississauga, Ontario.

17.    Hershey's Canadian and United States operations are significantly integrated. Hershey's selling and marketing organization is comprised of the North American Commercial Group, the International Commercial Group, and the Global Growth and Innovation Group.  Hershey intended this organization to "leverage [Hershey's] marketing and sales leadership in the United States and Canada."  In December 2007, John P. Bilbrey became Senior Vice President of Hershey Co. and President of "Hershey North America," and many other officers and senior managers of Hershey are defined as having "North American" responsibilities.

18.     Hershey is the largest manufacturer of chocolate candy products in the United States with an estimated 43% of the U.S. market share (measured in dollar sales volume). Hershey manufactures such chocolate candy product brands as Almond Joy, Cacao Reserve, Cadbury, 5th Avenue, Heath, Hershey's Milk Chocolate, Hershey's Milk Chocolate with Almonds, Hershey's Extra Dark, Hershey's Special Dark, Hershey's Pot of Gold, Hershey's Sticks, Hershey's Kisses, Kit Kat, Krackel, Miniatures, Mounds, Mr. Goodbar, Milk Duds, Hershey's Nuggets, Pay Day, Reese's Peanut Butter Cups, Reese's Pieces, Reese Sticks, Rolo, S'Mores, Skor Bars, Symphony, Take Five, Whoppers Malted Milk Balls and York Peppermint Pattie. Additionally, Hershey manufactures and distributes in the United States certain chocolate candy products under license, including products under a license from Defendant Cadbury, and the Kit Kat bar under a license from Defendant Nestlé S.A.

19.     About 90% of Hershey's sales are in the United States and about 95% of Hershey's sales are within North America.

20.     (a)     Hershey Co. and Hershey Canada each was a member of the conspiracy alleged in this Complaint because, among other reasons, each of them participated in the conspiracy through the actions of their respective officers, employees and representatives.

(b)     Alternatively, Hershey Canada was a member of the conspiracy alleged in this Complaint because of, among other reasons, its status during the Relevant Period as the alter ego or agent of Hershey Co., as evidenced by, among other things, Hershey Co.'s domination or control over: (i) the prices at which Hershey Canada sold chocolate candy products; (ii) the hiring and firing of officers or members of the Board of Directors of Hershey Canada; (iii) the budgets for Hershey Canada; (iv) the capitalization of and/or loans to Hershey Canada; (v) the transfer of officers or employees between Hershey Co. and Hershey Canada; (vi) financial benefits provided to

7

officers or employees of Hershey Canada; and (vii) the business plan or operation of Hershey Canada. Moreover, officers or employees of Hershey Co. communicated with, provided services to, or called on purchasers of chocolate candy products despite the presence or with the knowledge of Hershey Canada. Hershey Co. also used Hershey Canada as its instrumentality and conduit to obtain information about other Defendants' and/or co-conspirators' production, pricing or sale of chocolate candy products, which information Hershey Co. then used to charge Plaintiffs and others prices for chocolate candy products that were higher than Hershey Co. would or could have charged in the absence of the collusion among Defendants and their co-conspirators. During the Relevant Period, Hershey Co. dominated or controlled Hershey Canada with respect to the unlawful activities as alleged in this Complaint.

21.     During the Relevant Period, Hershey's chocolate candy products sales in the United States were approximately as follows:

| Year | Chocolate Sales |
| --- | --- |
| 2002 | $1.73 billion |
| 2003 | $1.79 billion |
| 2004 | $1.89 billion |
| 2005 | $1.95 billion |
| 2006 | $1.96 billion |

**The Mars Defendants**

22.     Defendant Mars, Incorporated is a Delaware corporation with its headquarters located at 6885 Elm Street, McLean, Virginia 22101. Mars, Incorporated is a private company and worldwide manufacturer of chocolate candy products, pet food and other food products with $21 billion in annual sales. During the Relevant Period, Mars, Incorporated manufactured, sold and/or

distributed chocolate candy products, directly and/or through its predecessors, affiliated companies, and/or subsidiaries, to customers throughout the United States and North America.

23.    Defendant Mars Snackfood U.S., LLC, headquartered at 800 High Street, Hackettstown, New Jersey, is a business unit of Defendant Mars, Incorporated.  Mars Snackfood U.S., LLC, directly and/or through its predecessors, affiliated companies and/or subsidiaries, manufactures and sells chocolate and non-chocolate candy products throughout the United States.

24.    Defendants Mars, Incorporated and Mars Snackfood U.S., LLC, hereinafter collectively referred to in this Complaint as "Mars," is the second largest manufacturer of chocolate candy products in the United States, with an estimated 24% share of the U.S. market.  Mars manufactures such chocolate candy product brands as Three Musketeers, Dove Chocolate, M&Ms, Mars Bar, Milky Way, Snickers and Twix.  Mars' manufacturing facilities are located in Georgia, Illinois, Tennessee, Pennsylvania, South Carolina, Ohio, Mississippi, Texas, Nevada, California and New Jersey.

25.    Mars, Incorporated, Mars Snackfood U.S., LLC and Mars Canada, Inc. ("Mars Canada") (an indirect operating subsidiary of Mars Incorporated) each was a member of the conspiracy alleged in this Complaint because, among other reasons, each of them participated in the conspiracy through the actions of their respective officers, employees and representatives.

26.    During the Relevant Period, Mars' chocolate candy sales in the United States were approximately as follows:

| Year | Chocolate Sales |
|------|-----------------|
| 2002 | $1.067 billion |
| 2003 | $1.128 billion |
| 2004 | $1.891 billion |
| 2005 | $1.944 billion |
| 2006 | $1.963 billion |

**The Nestlé Defendants**

27.    Non-Defendant Nestlé S.A. is a Swiss company with its principal place of business at Ave Nestlé 55, Caisse Postale 353, Vevey, Vaud CH-8100 Switzerland.  Nestlé S.A. is the world's largest food and beverage company.  Nestlé S.A. participates in numerous markets, including coffee, water, other beverages, ice cream, infant nutrition, health food, pet food, soups, seasonings, pasta sauces, frozen food, refrigerated products, chocolate candy products, and biscuits.

28.    Defendant Nestlé USA, Inc. ("Nestlé USA") is a Delaware corporation with its principal place of business at 800 North Brand Boulevard, Glendale, California.  Nestlé USA is a wholly-owned subsidiary of Nestlé S.A., employs between 15,500 and 17,000 employees, and had $8.5 billion in sales in 2006.  Nestlé USA is grouped into various divisions, including chocolate and confectionary, coffee and beverages, food services, ice cream, nutrition, water, and pet care. During the Relevant Period, Nestlé USA manufactured, sold and/or distributed chocolate candy products, directly and/or through its predecessors, affiliated companies, and/or subsidiaries, to customers throughout the United States and North America.  Nestlé USA was a participant in the conspiracy alleged in this Complaint.

29.    Non-Defendant Nestlé Canada Inc. ("Nestlé Canada") is a Canadian corporation with its principal place of business at 25 Sheppard Avenue West, Floors 18-22, North York, Ontario. Nestlé Canada is a wholly-owned subsidiary of Nestlé S.A., and is grouped into various divisions, including chocolate and confectionary, coffee and beverages, food services, ice cream, nutrition, water, and pet care.

30.    Non-Defendants Nestlé S.A., Defendant Nestlé USA, and Non-Defendant Nestlé Canada are individually and collectively referenced herein as "Nestlé."

31.     Nestlé USA, along with Nestlé companies operating in other countries, is managed and organized by geographic zones.  Zone "AMS" is the food and beverage operations in the Americas, including the United States, Canada, Latin America and the Caribbean.  A single executive officer of the parent corporation is responsible for the management of Zone AMS.

32.     Nestlé USA is the third largest manufacturer of chocolate candy products in the United States, with an estimated marketshare of over 8%, manufacturing such brands as Nestlé Crunch, Nestlé Milk Chocolate, Butterfinger, Baby Ruth, Nestlé Chunky, Nestlé Turtles, Nestlé Goobers and Wonka Bars.

33.     In addition to sales of Nestlé's brands of chocolate candy products in the United States, Nestlé receives additional income from royalties under a license agreement with Hershey, to which Nestlé has granted a perpetual, exclusive license in the United States for brands including the Kit Kat bar and Rolo.  The Kit Kat bar is the world's number two chocolate bar after Snickers.

34.     During the Relevant Period, Nestle USA, Inc.'s chocolate sales in the United States were approximately as follows:

| Year | Chocolate Sales |
|------|-----------------|
| 2002 | $342.7 million  |
| 2003 | $358.2 million  |
| 2004 | $372.4 million  |
| 2005 | $368.7 million  |
| 2006 | $363.6 million  |

**The Cadbury Defendants**

35.     Defendant Cadbury Holdings Ltd. (formerly known as Cadbury Schweppes plc) is a major international food and beverage company incorporated under the laws of the United Kingdom, with its headquarters located at 25 Berkeley Square, London WIJ 6HB, United Kingdom. As stated in Cadbury's Amended Rule 7.1 Corporate Disclosure filed with this Court on June 13, 2008, Cadbury Schweppes plc changed from a public to a private company and changed its name

to Cadbury Holdings Ltd.  The shares of Cadbury Holdings Ltd. are wholly owned by Cadbury plc, which is a publicly-held corporation that has no parent company.  Cadbury Holdings Ltd.'s principal businesses are confectionary and non-alcoholic beverages, and it has the largest share of global confectionary sales.  Cadbury has confectionary operations in the U.S. and Canada.  During the Relevant Period, Cadbury licensed Hershey Co. to manufacture and distribute chocolate candy products such as York Peppermint Patties, Peter Paul Mounds, and Peter Paul Almond Joy worldwide and Cadbury and Caramello branded products in the United States.  During the Relevant Period, Cadbury Holdings Ltd. manufactured, sold and/or distributed chocolate candy products, directly and/or through its predecessors, affiliated companies, licensees, and/or subsidiaries, to customers throughout the United States and North America.

36.     Defendant Cadbury plc ("Cadbury plc") is a British entity with its principal place of business at 25 Berkeley Square, London, W1J 6HB, United Kingdom.  Cadbury plc is the world's largest confectionery company.  During the Relevant Period, Cadbury licensed several popular chocolate confectionery products to Hershey Co. for sale in the United States, including York Peppermint Patties, Mounds and Almond Joy.  Cadbury plc organizes its business by geographic region and includes the U.S. and Canada in its Americas region.  During the Relevant Period, Cadbury plc manufactured, sold, and/or distributed via license chocolate candy products in the United States.

37.     Defendant Cadbury Adams Canada, Inc. ("Cadbury Adams Canada") is a Canadian corporation with its principal place of business at 5000 Yonge Street, Suite 2100, Toronto, Ontario. Cadbury Adams Canada is a subsidiary of Defendant Cadbury Holdings Ltd.  Cadbury Adams Canada manufactures and sells a wide array of candy products.  During the Relevant Period,

Cadbury Adams Canada manufactured and sold chocolate candy products to purchasers in the United States and Canada, directly or through its predecessors, affiliates and/or subsidiaries.

38.     Defendants Cadbury Holdings Ltd., Cadbury plc, and Cadbury Adams Canada are collectively referenced in this Complaint as "Cadbury".

39.     Under the license agreements between Cadbury and Hershey, Hershey senior management is required to meet quarterly with the senior management of Cadbury to discuss "the marketing, promotion and sales of the Licensed Products in the Territory."  Hershey also agrees to "review and consult" with Cadbury before adopting any marketing plan for the Licensed Products and to provide Cadbury with the annual marketing plan.

## CO-CONSPIRATORS AND AGENTS

40.     Various other persons, firms, corporations and entities not named as Defendants have participated as co-conspirators with Defendants in violation of the antitrust laws of the United States.  These co-conspirators include, without limitation: Itwal, Ltd., which is a national network of independent, diversified retail and foodservice wholesale distributors based in Canada.  Mars Canada.  Before May 8, 2007, Mars Canada was known as Effem, Inc.  Nestlé S.A., which is a Swiss company and the world's largest food and beverage company.  Nestlé Canada Inc. which is a wholly-owned subsidiary of Nestlé S.A.  Plaintiffs reserve the right to amend this pleading to name other Defendants.  Each Defendant acted as the agent of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

41.     Whenever in this Complaint reference is made to an act, statement or transaction of business by any corporation or entity, the allegation means that the corporation or entity engaged in the act, deed or transaction by or through its directors, members, partners, officers, employees or agents, within the scope of his/her authority, while they were actively engaged in the

management, direction, control, conduct or transaction of the corporation or entity's business or affairs.

## PRODUCT

42.     Chocolate is made from raw and processed foods that are produced from the seed of the tropical cacao tree.  The seeds of the cacao tree have an intense bitter taste, and must be fermented to develop their flavor.  After being roasted and ground, the resulting products are known as cocoa or chocolate.  Chocolate is any product made primarily of cocoa solids and cocoa fat.  The different flavors of chocolate can be obtained by varying the time and temperature when roasting the beans, by adjusting the relative quantities of the cocoa solids and cocoa fat, and by adding non-chocolate ingredients.

43.     The term "chocolate candy products," as used in this Complaint, refers to chocolate bars and other chocolate confectionary products (*e.g.*, 3 Musketeers, Hershey's Kisses, Dove Chocolates, M&Ms, Miniatures, etc.), as well as boxed chocolates and seasonal novelty chocolates packaged to be sold at retail.

44.     The market for the production of chocolate candy products in the United States is concentrated, and during the Relevant Period that market was dominated by Defendants and their co-conspirators.

45.     The market for the manufacture of chocolate candy products is mature and, but for the conspiracy alleged in this Complaint, manufacturers/sellers, including Defendants and their co-conspirators, compete primarily on price.

46.     Because of their high collective market share globally as well as in the United States and Canada, Defendants, when acting collectively, are able to exercise market power (including the ability to raise prices) in the United States market for the manufacture/sale of chocolate candy

products (hereinafter the "Relevant Market"). The U.S. market for chocolate candy products is by far the largest such market in the world (as measured by dollar sales volume). Defendants collectively have a 76% share of the Relevant Market.

47.   The Relevant Market is characterized by significant barriers to entry. The manufacture of chocolate candy products is highly technical, requiring considerable understanding of food technology, including hardware (processing machinery and computers), software, and formulation technology. Technical know-how is required to integrate these elements into an effective production system that results in a high-quality product.

48.   Any new entrant to the market must be able to spend significant sums on advertising and product proliferation. Advertising spending can be divided into two different costs: (1) introductory advertising costs, and (2) maintenance advertising costs. Introductory costs are those incurred in order to enter the market or launch a new product. For example, in 2000, Mars spent $40 million to introduce its new Snickers "Cruncher." In 2005, Hershey spent $15 million to launch Hershey's Sticks. Maintenance advertising costs are those incurred to maintain a company's presence in the market, and are necessary to create repeated buys. Between 2002 and 2007, Hershey Co. reported spending an average of $134,573,000 per year on advertising. These substantial marketing costs are necessary to create the illusion of differentiated products and to gain market share in an industry where the products are, in actuality, quite fungible.

49.   Access to supply channels is critical to gain a foothold in the Relevant Market, as wholesale distributors, chain grocery stores, mass merchandisers, chain drug stores, vending companies, wholesale clubs, convenience stores, dollar stores, concessionaires, and department stores form the most significant distribution channels for sales of Defendants' chocolate candy

products.   This sort of widespread distribution of chocolate candy products is necessary, yet extremely costly for a company looking to enter the market.

50.    While barriers to entry in the Relevant Market are very high, there are essentially no barriers to expansion in this market.  Defendants typically operate at significantly less than full capacity.  Consequently, in the absence of collusion they have the ability to compete against one another – if they want to – for market share both by manufacturing more product and by introducing new products.

## TRADE AND COMMERCE

51.    During the Relevant Period, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial.   In particular:

(a)    Defendants and their co-conspirators sold and shipped substantial quantities of chocolate candy products in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants produced the chocolate candy products;

(b)    data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States; and

(c)    money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States.

52.    The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiffs' claims.

## TOLLING OF THE STATUTE OF
## LIMITATIONS AND FRAUDULENT CONCEALMENT

53.     The statutes of limitations as to Defendants' continuing antitrust violations were tolled by the pendency of class action complaints against Defendants for conspiring to fix prices of chocolate candy products.

54.     The statutes of limitations as to Defendants' continuing antitrust violations were also tolled by Defendants' fraudulent concealment as alleged below.

55.     Plaintiffs did not know more than four (4) years before filing their lawsuits that Defendants and/or their co-conspirators had entered into the conspiracy not to compete on the sale of chocolate candy products sold to Plaintiffs and others in the United States.

56.     During the Relevant Period, Plaintiffs used a method of purchasing chocolate candy products that caused each of them to believe in good faith at the time that each of them was paying competitive prices for chocolate candy products purchased from Defendants and their co-conspirators.

57.     Defendants' and their co-conspirators' conspiracy was self-concealing, which prevented Plaintiffs from discovering its existence more than four (4) years before filing their lawsuits.  Notwithstanding the self-concealing nature of their conspiracy Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiffs by, without limitation, and upon information and belief, one or more of the following acts:

(a)     Providing Plaintiffs and others with false or misleading explanations for changes in the price of chocolate candy products so as to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion;

(b)    Issuing price announcements for chocolate candy products so as to create the illusion of competitive pricing in the industry when, in fact, the pricing was not competitive;

(c)    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(d)    Confining the anticompetitive, unlawful plan to a limited number of people and key officials at each Defendant company;

(e)    Avoiding either references in documents or the creation of documents otherwise generated in the ordinary course of Defendants' and/or their co-conspirators' businesses regarding conduct which would constitute an antitrust violation or anticompetitive act;

(f)    Conducting covert, secret conspiracy communications or meetings in the United States, Canada and/or in Europe.

58.    Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon before the statute of limitations was tolled because of the self-concealing character of the conspiracy and/or because of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy.

59.    Plaintiffs' claims have been brought within the applicable limitations period.

## FACTS OF THE UNLAWFUL AGREEMENT

### Coordinated Price Increases in the United States

60.    Early in the 2000's, growth in the chocolate candy products business slowed. In the United States, for example, the business experienced a growth rate of approximately 9.10% in 2000, but only 0.80% in 2001. Further, as a result of Americans' health concerns and other factors, the chocolate candy products business was expected to experience steadily declining growth rates through at least 2008.

61.    In the face of this waning demand, and the prospect of stagnating revenue, Defendants decided to engage in collective self-help (*i.e.*, collusion) in order to increase their prices, revenues and profits.  Starting in approximately late 2002, pursuant to an unlawful agreement to fix prices, Defendants engaged in a series of coordinated price increases on their chocolate candy products in the United States.

62.    Defendants sell and Plaintiffs purchase chocolate candy products primarily on the basis of price.  Despite brand loyalty, each Defendant's chocolate candy products are substitutable for one another.  Price is the most important competitive factor in the sale of chocolate candy products, and the standardized nature of chocolate candy products hinders substantial and material non-price competition.

63.    On or about December 6, 2002, Mars announced price increases of approximately 10.7% on its regular sized chocolate bars ("Singles"), and approximately 22% on its Multi-Pack Six Packs for several of its chocolate bars (Milky Way, Snickers, 3 Musketeers, Snickers Almond, Twix Caramel Cookie), all to be effective December 9, 2002.  Mars asserted publicly that the price increases were driven by the rising cost of raw materials, labor and transportation.

64.    On or about December 9, 2002, Hershey announced a U.S. price increase of approximately 10.7% for its regular sized chocolate bars ("Standard Bars") approximately 13.6% for its King Size bars, approximately 7.6% for its 6-Packs of bars, and approximately 15.4% for its 10-Packs of bars, all to be effective January 1, 2003.  Hershey stated publicly that the price increases were the result of increases in raw ingredient costs.

65.    On or about December 12, 2002, Nestlé instituted a price increase of approximately 10.3% on its regular sized chocolate bars ("Singles"), approximately 14.5% on its king size bars ("Kings"), and approximately 16.8% on its multi-count packs ("10-pack").  Nestlé asserted publicly

19

that the price increases were caused by increases in raw material, packaging, labor and transportation costs.

66.    On or about November 19, 2004, Mars announced a second price increase on its baglines ("Peg Packs," "Small Bags," "Medium Bags," "Large Bags," "X-Large Bags," and "Travel Cups") ranging from 2.9% to 15.6% effective on November 19, 2004.

67.    On or about on December 17, 2004, Mars also instituted price increases of approximately 5.5% on its regular bars ("Singles"), approximately 8.5% on its Multi-Pack Six Packs, and approximately 4.7% on its King Size Packs.

68.    On or about December 15, 2004, Hershey instituted a second price increase of approximately 5.5% on its Standard Bars, approximately 4.7% on its King Size bars, approximately 8.5% on its 6-Packs, approximately 5.5% on its Variety Packs, and increases ranging from approximately 2.5% to 7.6% on its Chocolate Packaged Candy, Large Chocolate Peg bags, Kisses Peg Bags, and Travel Cups.

69.    On or about December 22, 2004, Nestlé instituted a price increase of approximately 5.7% on its regular chocolate bars ("Singles"), approximately 4.8% on its king size bars ("King Bars"), approximately 7.7% on its 6-Packs of chocolate bars, approximately 7.5% on Chocolate Peg Bags and Chocolate Miniatures, and additional price increases on other chocolate candy products.

70.    Defendants again attributed this second round of price increases to increased input costs.

71.    Defendants instituted a third round of coordinated price increases in March and April of 2007.  On or about March 23, 2007, Mars instituted price increases of approximately 5.3% on its regular chocolate bars ("Singles"), Multi Packs, 6-Packs and Variety Packs; approximately 4.5% for

its King-size bars, and approximately 15% for its Dove Packages.  Mars again cited alleged cost increases for raw materials, advertising and labor costs.

72.    On or about April 4, 2007, Hershey announced price increases effective April 7, 2007 of approximately 5.2 % for Standard Bars, Standard Size Variety Packs, and 6 Packs, and approximately 4.5% for King Size Bars and King Size Variety Packs.  Hershey again publicly attributed the price increases to alleged raw material and other cost increases.

73.    On or about April 5, 2007, Nestlé instituted price increases of approximately 5.4% on its regular chocolate bars ("Singles"), approximately 4.6% on its king size bars ("Kings"), approximately 4.6% on its 6 packs ("6 Pack Trays"), as well as additional price increases on other chocolate candy products.

74.    Defendants' repeated public assertions that the price increases resulted from increased input costs were false and pretextual.  The price increases resulted from an express agreement among Defendants and their co-conspirators to fix, raise, stabilize, and maintain prices on chocolate candy products in the United States.

75.    Cocoa beans account for more than 25% of the cost of inputs for Defendants' chocolate candy products.  The price of cocoa beans either decreased or remained stable from 2003 through 2007.  Although there were sporadic increases in the price of cocoa, they were short-lived and offset by futures contracts and/or forward purchasing.  Defendants use these forward purchasing and futures contracts to cover future manufacturing requirements and to take advantage of downward market fluctuations when possible and to reduce risks associated with upward fluctuations in input costs.

76.    Sugar accounts for about 16% of the cost of inputs for Defendants' chocolate candy products.  Sugar prices were stable during the Relevant Period, with the exception of a brief spike

in late 2005 following the 2005 hurricane season. Sugar prices fell in 2006 as sugar crops recovered.

77.    Likewise, the price of milk (about 12% of Defendants' input costs) fluctuated within a relatively narrow range over the Relevant Period, and was moving down as often as it was moving up.

78.    No other input accounts for more than 5% of Defendants' total input costs for chocolate candy products. And no other input, labor, or other cost levels explain Defendants' price increases.

79.    When Mars announced the first collusive price increase in December 2002, Defendants had been unable to get any announced price increase to "stick" in the Relevant Market since 1995. A chocolate manufacturer that pre-announced a price increase under the market conditions existing during the Relevant Period would face significant negative market repercussions if its competitors failed to take a similar price increase. If the competitors failed to match the announced price increase, the prospect of significant lost sales would force the manufacturer to rescind the announced price increase. Rescinding the increase would cause significant disruption in the marketplace because, upon learning of a planned price increase, Defendants' customers incur substantial management time and expense to plan for and implement the increase. A manufacturer therefore loses significant customer goodwill by announcing and then rescinding a price increase. In announcing the first collusive price increase in December 2002, however, Mars was confident that the increase would "stick" because the Defendants had expressly agreed on it.

80.    Defendants implemented the collusive price increases despite not only stable input costs, but also flat or declining demand. Absent their unlawful agreement, Defendants could not have profitably increased prices in these conditions. The five-year Compound Annual Growth Rate

22

for Manufacturer Shipments of Chocolate for all subcategories over the period from 2002 to 2006 was 1.0% as reported by the U.S. Department of Commerce. In his earnings presentation to investors following the December 2002 price increase announcement, Hershey's then-chairman and CEO Richard Lenny reduced estimates of sales growth. Reuters reported on December 13, 2002: "The largest U.S. chocolate maker, which has been posting flat shipment growth, had previously forecast sales growing 3 percent to 4 percent. However, the candy market is showing signs of slack demand, increased competition, and inventory reduction by retailers." Villanova University marketing professor William Madway recently described the U.S. chocolate candy products industry as "a mature, bordering on declining, industry."

81.    Defendants' conspiracy was successful in overcoming the downward pressure that this stable-to-declining demand put on prices for chocolate candy products. This static or declining demand dramatically reduced Defendants' ability to profitably take unilateral price increases and likewise increased their incentive to collude to avoid price competition.

82.    Defendants' unlawful agreement allowed them to increase simultaneously profits and profit margins on sales of U.S. chocolate candy products despite stable or declining demand. For example, in July 2003, Hershey reported that its second quarter net profits rose to $71.5 million compared with $63.1 million for the same period in 2002. Hershey attributed the increase in profits, in part, to the implementation of the price increase announced in December 2002. Hershey also credited decreasing raw material costs with improving profit margins.

83.    Likewise, in 2004, Hershey posted record-breaking net income of more than $574 million. Hershey publicly attributed its extraordinary profits to marketplace momentum, as well as record sales, earnings, and returns. In reality, Hershey's soaring profits resulted in significant part from the unlawfully inflated prices for its chocolate candy products.

23

84.     Pursuant to their unlawful agreement, none of the Defendants took the others' price increases as an opportunity to increase unit sales and market share by reducing or holding steady its own prices.  Absent the unlawful agreement, each Defendant's unilateral interest would have been to increase unit sales by offering lower prices than its competitors.  Indeed, throughout the Relevant Period, Hershey and Nestlé had significant excess capacity for producing chocolate candy products.  Pursuant to the unlawful agreement, however, the Defendants refrained from engaging in price competition, with the result that each of Defendants' respective market shares remained stable throughout the Relevant Period.

85.     Defendants' unlawful agreement was facilitated by the fact that the Relevant Market is highly concentrated.  Hershey is the largest manufacturer of chocolate candy products in the United States, with a 43.3% market share (in dollar sales volume) in 2005.  Mars is the second largest producer in the United States, with a 24.3% market share; Nestlé is third with an 8.9% market share.  Together with Cadbury's chocolate candy line licensed to Hershey, these four Defendants collectively control 76% of the Relevant Market, far exceeding the United States Department of Justice's guidelines indicating highly concentrated industries.

86.     This concentration facilitated Defendants' coordination, making it easy both to enter into and monitor compliance with the cartel agreement.  Defendants' collective dominance of the Relevant Market prevented Plaintiffs and other purchasers from responding to Defendants' price increases by switching to other suppliers.  The concentration also made it easy for Defendants to ensure that none of them "cheated" on the cartel by secretly offering lower prices to purchasers. Defendants monitored each other's prices and sales through direct communications, industry trade publications, and trade association activities.  As noted above, each Defendants' market share has in fact remained stable throughout the Relevant Period.

87.    Defendants' collusion was also easy because each Defendant sells chocolate candy products directly to grocery retailers, drug stores, convenience stores, movie theaters, vending machine operators and mass merchandiser stores, as well as to distributors.  There are many thousands of retailers of chocolate candy products in the United States.

88.    With many buyers, each of which represents only a small part of each Defendants' total U.S. sales, Defendants had little incentive to cheat on their collusive pricing arrangements.  Each sale made by each Defendant was small, while the potential penalty for cheating on the unlawful agreement (*e.g.,* loss of unlawful supracompetitive profits on all of the Defendants' U.S. sales) was large.

89.    Implementing and monitoring Defendants' unlawful agreement was also made easy by the fact that each Defendant sells at the same wholesale and retail levels of the distribution chain and that chocolate candy products are commodity-like products that each Defendant sells in three standard sizes.

90.    Defendants had ample opportunity and means to conspire, using not only electronic and telephonic communications, but also in-person meetings.  For example, Defendants' high-ranking executives with pricing authority routinely met at numerous trade association meetings during the Relevant Period.

91.    As set forth in detail below, during the Relevant Period the Defendants also agreed to raise, maintain, fix, and stabilize prices of chocolate candy products in Canada.  The facts of that conspiracy establish and confirm that Defendants also fixed prices in the United States.  For example:

(a)    The market structure in Canada is essentially the same as that in the United States, with the same dominant suppliers – the Defendants and their co-conspirators – collectively

controlling approximately 64% of the Canadian market. That Defendants and their co-conspirators could not achieve parallel price increases in Canada without expressly agreeing to fix prices confirms that they also could not achieve parallel price increases in the Untied States without expressly agreeing to fix prices.

(b)     During the Relevant Period, Hershey, Mars and Nestlé and their co-conspirators each had integrated management of its Canadian and U.S. operations. Hershey's Canadian and U.S. operations responsible for selling and marketing chocolate candy products were organized under the "North American Commercial Group" as well as the "International Commercial Group" and the "Global Growth and Innovation Group." Mars management responsible for selling and marketing chocolate candy products in the U.S. and Canada were fully integrated in that several executive officers and senior managers of Mars had world-wide responsibility for selling and marketing chocolate candy products. Nestlé sold and marketed its chocolate candy products both in the U.S. and Canada as a single geographic zone known as zone "AMS." The same executive officers and key management personnel were responsible for marketing and selling chocolate candy products in both Canada and the United States.

(c)     Defendants' senior executives in the United States were aware of and condoned the conspiracy in Canada. For example, many of Defendants' and their co-conspirators' executives received copies of the large volume of inculpatory documents reflecting the organization and progress of the Canadian conspiracy. Some or all of 20 such documents reflecting the collusion were sent to seven executives of Cadbury, five executives of Mars, five executives of Hershey, and four executives of Nestlé. Moreover, thirty (30) of Defendants' and their co-conspirators' executives and employees are already known to be participants in the Canadian conspiracy. The number of meetings and communications among the highest level of management of the Canadian

units, and the large number of executives involved, indicates that the executives in the United States were aware of the Canadian activities.

(d)     Despite their knowledge of the Canadian conspiracy, the United States executives of Hershey, Mars and Nestlé did nothing to stop that conduct over a five-and-a-half year period.  It is not plausible that the same executives who control 76% of the United States chocolate candy market would conspire or condone a conspiracy with regard to 5% of their North American business in Canada and not conspire or condone a conspiracy with regard to the 90% of their North American business in the United States.

(e)     The price increases taken by Defendants pursuant to their Canadian conspiracy were roughly contemporaneous with and roughly the same magnitude of the price increases that Defendants took pursuant to their unlawful agreement in the United States.

(f)     Defendants' and their co-conspirators' price-fixing in the Canadian market would not have been effective unless they had also fixed prices in the United States market.  The economic features evidencing this fact include: (1) the low cost to transport chocolate candy products between the U.S. and Canada; (2) the low cost of import/export duties and quotas for chocolate candy products between Canada and the U.S.; (3) a statistically meaningful correlation between the market price and market price movements of chocolate candy products sold in the U.S. and Canada, such that a price change and the magnitude of the change in one location is generally reflected in the other; (4) the existence of large and common customers in the U.S. and Canada; (5) closely similar production inputs to manufacture chocolate candy products in the United States and Canada; (6) supply and demand features in the U.S. and Canada that are sufficiently homogenous such that conditions that occur in or affect the U.S. chocolate candy market also affected the market in Canada, and vice versa; (7) the need for Defendants and their

27

co-conspirators to make business  decisions about the production and sale of chocolate candy products based on the production, manufacturing and sale of chocolate candy products in both the U.S. and Canada; (8) the cost structure to produce chocolate candy products was such that an increase in manufacturing costs in the United States would cause Defendants to shift production to Canada and import product into the U.S. and vice versa; and (9) the need for Defendants and their co-conspirators to monitor, measure and control supply and pricing of chocolate candy products sold both in the U.S. and Canada.

(g)     During the Relevant Period, and as a result of Hershey's licensing agreements with Nestlé and Cadbury, Defendants and their con-conspirators each sold complementary chocolate candy products in Canada and the United States.  For example, pursuant to these arrangements, Hershey manufactured and sold its Kit Kat candy bar in the U.S., while Nestlé manufactured and marketed Kit Kat in Canada; Hershey manufactured and marketed the Oh Henry chocolate bar in Canada, while Nestlé manufactured and marketed the Oh Henry bar in the U.S.; Nestlé manufactured and marketed Hershey's Rolo brand candy bar in Canada, while Hershey manufactured and marketed it in the U.S.; and Cadbury manufactured and marketed its Cadbury brand bar in Canada while Hershey manufactured and marketed the Cadbury bar in the U.S.

(h)     During the Relevant Period, Defendants manufactured significant quantities of a processed input known as "block chocolate" in Canada that they imported into the United States for processing into chocolate candy products.  Due in large measure to cost savings advantages of lower sugar supply prices in Canada (Canada does not regulate the price of refined sugar to the same extent as it is regulated in the United States), and because there are no quotas on U.S. block chocolate imports into the U.S., Defendants and their co-conspirators manufactured (or at times purchased) significant amounts of block chocolate which they then imported into the

28

United States for their own use in manufacturing chocolate candy products. During the Relevant Period, upwards of 95% of Canadian exports of chocolate candy products are exported to the U.S.; Canadian imported chocolate amounted to over 60% of the chocolate candy products imported into the U.S. during the Relevant Period, and Defendants both exported and imported significant quantities of finished chocolate candy products between the U.S. and Canada. From locations in the U.S., Defendants processed and manufactured chocolate candy products for export to Canada. From locations within Canada, Defendants and their co-conspirators processed and manufactured chocolate candy product for export to the U.S. For example, government-supplied import/export data show that during the time period 2002-2008, Canadian chocolate candy products annually amounted to 300 million kilograms exported to the U.S. and that U.S. chocolate candy products amounted to 100 million kilograms exported from the U.S. to Canada. Canada was the source of over $700 million in chocolate imports to the United States annually between 2004 and 2006.

(i)     The opportunity for arbitrage, and the fact of arbitrage, between the United States and Canada is so extensive and, as detailed above, the sales and prices of chocolate candy products in the United States and Canada are so interdependent, that Plaintiffs allege, in the alternative, that there is a single market for the manufacture/sale of chocolate candy products in the United States and Canada. As such, when Defendants and their co-conspirators colluded on the sale of chocolate candy products in Canada, their actions either directly affected the price of chocolate candy products sold to Plaintiffs and others in the United States or, in conjunction with these conspiracy communications, they also directly conspired not to compete in the sale of chocolate candy products sold to Plaintiffs and others in the United States.

(j)     The Canadian investigation conducted during the Summer and Fall of 2007 coincided with a number of terminations of Hershey's senior executives. Hershey Co. CEO Richard

H. Lenny announced his retirement on November 11, 2007 at age 56.  On November 30, 2007, Hershey Co. announced that its Senior Vice President, Global Chief Growth Officer, and former head of U.S. Confectionary and Chief Marketing Officer, Thomas K. Hernquist, had resigned at age 49.

**Details of the Canadian Conduct**

92.     The Canadian Competition Bureau began a criminal investigation in July 2007 into price-fixing in the market for chocolate candy products sold in Canada.  Cadbury has effectively admitted guilt in the Canadian conspiracy, entering the Canadian immunity program and presenting highly incriminating evidence described in detail in affidavits filed by the leading Canadian investigator against Hershey, Mars and Nestlé.

93.     The affidavits state that the price-fixing communications and exchanges of confidential pricing information were often made at the most senior levels of the companies involved.  In the case of Cadbury, Hershey and Nestlé, "the alleged conspiracy was brought about and sanctioned at the highest levels of the companies involved.  The companies reached an agreement or arrangement whereby they would collaborate on increasing transaction prices for chocolate confectionary by raising list prices and/or reducing trade spend to customers."

94.     The affidavits disclose approximately 20 bulletins and letters written by Itwal, Ltd. to numerous executives and other employees of the four chocolate companies, and also disclose numerous meetings of high ranking executives of the Canadian companies, particularly Cadbury, Nestlé and Hershey.

95.     At least thirteen (13) individuals employed by Cadbury were "cooperating witnesses" in the investigation, supplying lawyers for the Canadian Competition Bureau with e-mails and information about telephone calls and private meetings involving Hershey, Mars, Nestlé, Cadbury and Itwal, Ltd.

30

96.    The Bureau's affidavits allege that the collusion began in February 2002 and continued until November 2007, during which time the chocolate manufacturers and Itwal, Ltd. "did by agreement, threat, promise or by like means, attempt to influence upward, or to discourage the reduction of, the price at which Cadbury, Hershey, Mars and Nestlé supplied or offered to supply or advertise chocolate confectionary products within Canada."

97.    On February 21, 2002, Itwal, Ltd. (described in paragraph 37 above) wrote letters to the senior management of each Canadian chocolate manufacturer, including Robert Leonidas of Nestlé Canada; Rick Meyers of Hershey Canada; Don Robinson of Mars; and Arthur Soler of Cadbury Adams Canada.  The letter was entitled "TAKE ACTION NOW!!" and stated as follows:

> At the 'end of the day' it is only the suppliers' control and discipline of the [discounting] that can restore functionality in the marketplace.  The problem is very serious and completely out of control on the part of the suppliers.  I am being forced to re-examine how we operate in the market and I am not sure it would be in the best interest of [Nestlé/ Hershey/ Mars/ or Cadbury].  I urge you to meet and take action before this chocolate bar 'bubble bursts.'

98.    The initial letter was followed by at least twenty (20) "TAN [Take Action Now] Information Bulletins" written to the senior executives and additional sales employees of the companies outlining the steps that the companies should take to address the problems, as well as confirming the actions actually taken by the companies and the success of the conspiracy.

99.    For example, "TAN Information Bulletin #4" dated April 5, 2002, was sent to the following people: Arthur Soler and Tim Mason of Cadbury Adams Canada; Don Robinson and Roy Benin of Mars Canada; Rick Meyers of Hershey Canada; and Bob Leonidas and Matt Hall of Nestlé.  TAN Information Bulletin #4 stated:  "it appears your efforts to 'dry up' this activity [discounting chocolate bars] may be starting to work. ... I want to take this opportunity to thank each of you for responding to our TAN initiative.  It is very positive and encouraging already. ... Potential gray

marketers have been identified and, in some cases, cut off. Others have had their volumes reviewed and capped or monitored in the situations where buying through a distributor." The bulletin referred to the distributor's "recommended 'floor price model'"; "an ongoing internal audit procedure" that the chocolate companies set up to "monitor account activities"; and the hiring of third party investigators "with results already being achieved."

100. Another bulletin dated December 12, 2002 – sent to Don Robinson, David Jones, Roy Benin and Kurt Hatherly of Mars Canada; Rich Meyers and Marc Morneau of Hershey Canada; Bob Leonidas, Matt Hall, Todd Hoffman and Al Kehoe of Nestlé Canada; and Tim Mason, Peter Allen and Doug Tyler of Cadbury Adams Canada – summarized the accomplishments for the year. The bulletin stated: "congratulations to you all as we wind up the year with respect to your concerted and committed efforts to clean up the dysfunctional retail trade spending"; that there was "significantly less diversion of bars re: back door at retail grocery, dollar stores, vending"; and that the efforts of cartel members "reduced unreasonably low retail prices."

101. Another bulletin dated April 25, 2003 – sent to David Schulthorp of Cadbury Adams Canada; Yves Dalcort, Don Robinson, Roy Benin and David Jones of Mars Canada; Bruce Brown, Mike Vissers and Shawn Allen of Hershey Canada; Bob Leonidas, Matt Hall, Todd Hoffman and Al Kehoe of Nestlé Canada; and Tim Mason, Lance Berrisford and Doug Ross of Cadbury Adams Canada – provides: "[w]e have had considerable discussion on the disfunctionality of 99c pricing on single bars" and reports a breach of the agreement at "Dollarama," stating "[w]ith a price increase just having been implemented, this situation becomes even more incredible."

102. Bulletins continued to be sent to the sales staffs of the chocolate companies at least through October 2003, where a bulletin requested the "presence of persons in leadership positions

at the upcoming meeting," referred to as "our upcoming October 28th business review," being planned to "discuss the inequity in the Market Place."

103.    The Bureau's affidavits also outline numerous secret meetings involving senior executives of the chocolate companies, including Eric Lent, General Manager of Hershey Canada Inc., who was appointed to that position in December 2006; Martin Lebel of Mars Canada Inc.; Robert Leonidas, President and CEO; Sandra Martinez de Arevalo, President of the confectionary business; Lynn Hashinsky and Steve Morris of Nestlé Canada Inc.; and thirteen (13) unnamed cooperating witnesses of Cadbury Adams Canada.

104.    The meetings took place in coffee shops, restaurants and at industry trade association conventions between February 2004 and September 2007. In addition to meetings, the competitors communicated by e-mail throughout the conspiracy.

105.    On February 23, 2004, the senior executive of Cadbury Adams Canada met with Robert Leonidas, Nestlé Canada's CEO, and discussed "trade spending practices" and Cadbury's plans to reduce discounts, rebates and allowances to customers. Cadbury's executive believed that Leonidas agreed with him on reducing discounts and that he had an open line to call Leonidas if there were any issues in the market, including discount practices.

106.    Beginning in June 2005, three cooperating witnesses at Cadbury were copied on internal e-mails disclosing Itwal, Ltd. acting as the liaison on coordinating a price increase in 2005:

> At ITWAL I was informed by a reliable source that both Nestlé and Effem have been to customers hinting at 2005 price increases. No details or confirmation. I suggested that we would seriously consider appropriate actions once firm details known, and that I would be concerned about the other leading player not following which my contact said they would inquire about.

107.    At the annual meeting of the Confectionary Manufacturers Association of Canada in June 2005, Robert Leonidas (Nestlé Canada's CEO) told Cadbury Adams Canada's top executive

words to the effect: "I want you to hear it from the top – I take my pricing seriously" or "We are going to take a price increase and I want you to hear it from the top." Mr. Leonidas then handed his competitor an envelope containing Nestlé Canada's confidential pricing information. The witness told authorities that Mr. Leonidas would have left the meeting with the idea that the witness' company would follow a price increase led by Nestlé Canada. The witness told the officials that he did not open the envelope until later "because you shouldn't talk about pricing. I didn't want to be rude to Bob, so I said OK, was neutral, but I didn't want him to think, in any way, that I was coordinating with him." The envelope contained a document about a planned 2005 price increase by Nestlé Canada.

108.    The same witness told his assistant to go to Mr. Leonidas's office on July 6, 2005 to pick up something. After arranging the time of the meeting, the assistant was met by Mr. Leonidas downstairs. Mr. Leonidas said something to the effect that "it was better not to be seen in his office" and handed the assistant an envelope. It also contained confidential information about a planned price increase by Nestlé Canada.

109.    Upon hearing a report on the contents of the envelope, Cadbury Adams Canada's top executive had his assistant forward the information to others at Cadbury Adams Canada, stating that "if Nestlé is going to take a price increase then we will too."

110.    Cadbury Adams Canada subsequently announced a price increase on July 29, 2005 averaging 5.2% effective October 31, 2005, so as to align its prices on a number of common formats with those of Nestlé Canada. Hershey announced an increase on August 23, 2005, effective October 31, 2005. Mars Canada announced a price increase averaging 6% on September 6, 2005, effective November 7, 2005.

111.    An e-mail chain at Cadbury Adams Canada on July 6, 2005 indicated that a letter containing confidential Nestlé Canada's price increase information was circulating around Cadbury Adams Canada's office.  The draft price increase announcement, dated July 15, 2007, stated that Nestlé was increasing prices approximately 5 to 7% effective October 31, 2005, for base confectionary and April 18, 2006, for seasonal confectionary.

112.    On February 15, 2006, the top executive of Cadbury Adams Canada met again with Robert Leonidas in Toronto and discussed the price of seasonal chocolate.  Leonidas said that he wanted Cadbury Adams Canada to take a price increase, but Cadbury's executive refused to commit to do so.  On October 30, 2006, however, Cadbury Adams Canada announced a price increase on seasonal chocolate of 5% on Halloween products and 4% for Easter products to take effect February 5, 2007.

113.    On July 4, 2007, another cooperating witness met Sandra Martinez de Arevalo, President of Nestlé Canada's confectionary business in Toronto.  According to the witness, Ms. Martinez suggested that the witness' company lead a price increase in 2007 and that Nestlé wanted to raise prices in the third quarter of 2007.  The witness responded that the company was not prepared to increase prices in 2007, but might be prepared to do so in 2008.  He further told Ms. Martinez that "he would follow on chocolate but not lead."

114.    On July 5, 2007, another cooperating witness at Cadbury Adams Canada received a call from Nestlé Canada employee Steve Morris, who stated that Nestlé Canada was thinking about taking a price increase in early March 2008.  Morris was told by the cooperating witness that Cadbury Adams Canada was thinking of taking a price increase too, and they discussed that Mars Canada would probably follow.

115.    On September 19, 2007, during an event in Vancouver, the top executive at Cadbury Adams Canada and Robert Leonidas discussed the fact that it was public information that Nestlé Canada was taking a price increase in February 2008 of 4 to 6% on all products, and stated words to the effect:  "You don't need to say anything."

116.    On January 3, 2007, Bert Alfonso, then Senior Vice President and Chief Financial Officer of Hershey Co. (USA), wrote an e-mail to the newly-appointed head of the Hershey Canada business, Eric Lent, and the head of Cadbury in Canada, introducing the two individuals and stating:  "In keeping with the good advice from 'The Godfather,' keep close to your competition, I am including contact info below in an effort to introduce you both.  All kidding aside, I know Eric is looking forward to meeting you."

117.    On January 4, 2007, the top Cadbury Adams Canada executive had a telephone conversation with Eric Lent.  On March 15, 2007, Lent proposed to meet with the Cadbury Adams Canada executives.

118.    Another Cadbury Adams Canada witness first met Eric Lent at a dinner hosted by the Food and Consumer Products of Canada trade association in Ontario on September 27, 2007.  Mr. Lent told him that Nestlé Canada was "taking a price increase" and "so we should take advantage" or "we should increase our prices too."  When the Cadbury witness balked at the discussion, Lent allegedly replied: "Don't worry, we can talk about it.  Bob [Leonidas] and I talk all the time.  It's public knowledge that Nestlé is taking its prices up."

## VIOLATIONS ALLEGED

### COUNT I
### Conspiracy to fix prices (15 U.S.C. § 1)

119.    Plaintiffs incorporate by reference the allegations above.

120.    Beginning at least as early as January 1, 2002, and continuing until in or about 2008, with an effect that continues, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on price in the sale of chocolate candy products in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

121.    The contract, combination and conspiracy among Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and sale of chocolate candy products, the substantial terms and purpose of which were:

(a)    To fix, stabilize, maintain and/or raise prices of chocolate candy products in the United States and elsewhere;

(b)    To allocate the volume of sales and/or market shares of chocolate candy products in the United States and elsewhere;

(c)    To allocate contracts to supply chocolate candy products in the United States and elsewhere; and/or

(d)    To control or reduce the output of and/or capacity to produce chocolate candy products in the United States and elsewhere.

122.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts:

(a)    They agreed to exchange and did exchange current and future price information about chocolate candy products sold in the United States and elsewhere;

37

(b)    They agreed to coordinate and did coordinate price levels and price movements of chocolate candy products sold in the United States and elsewhere;

(c)    They agreed on prices and price levels of chocolate candy products sold in the United States and elsewhere;

(d)    They agreed to eliminate or modify the practice of providing discounts, rebates and allowances to customers in connection with the sale of chocolate candy products;

(e)    They agreed to allocate and allocated among themselves chocolate candy product customers or sales volume, or both, in the United States and elsewhere;

(f)    They agreed to allocate and allocated market shares of chocolate candy products in the United States and elsewhere; and/or

(g)    They agreed to control or reduce, and did control or reduce, the output of and/or capacity to produce chocolate candy products in the United States and elsewhere.

123.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States, Canada and/or elsewhere to discuss the prices of chocolate candy products to be sold and/or the volume of chocolate candy products to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States, Canada and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy; and/or exchanging information on the sale of chocolate candy products in the United States and elsewhere.

124.    As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to these allegations:

(a)    Price competition in the sale of chocolate candy products among Defendants and their co-conspirators to Plaintiffs and others has been restrained, suppressed and eliminated;

(b)    Prices for chocolate candy products sold by Defendants and their co-conspirators have been raised, fixed, maintained and/or stabilized at artificially high and non-competitive levels throughout the United States and elsewhere; and

(c)    Plaintiffs and other direct purchasers of chocolate candy products from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

125.    Plaintiffs have been injured in their business or property by reason of Defendants' and their co-conspirators' antitrust violations in amounts not yet ascertained.  Plaintiffs' injuries as direct purchasers of chocolate candy products are injuries of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' and their co-conspirators' acts unlawful.

126.    Because Defendants controlled approximately 76% of the Relevant Market, their collective price increases provided sufficient cover, or a "price umbrella," for non-cartel chocolate manufacturers also to increase prices without fear of losing sales or market share.

127.    Plaintiffs are threatened by continuing loss and damage as a result of Defendants' and their co-conspirators' unlawful conduct.  Plaintiffs therefore are entitled to injunctive relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request a judgment:

A.      Declaring that the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, were in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

B.      Finding against Defendants, jointly and severally, in treble the amount of each Plaintiff's damages.

C.      Awarding to each Plaintiff its attorneys' fees, costs and interest as allowable by law.

D.      Entering a permanent injunction prohibiting Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

E.      Granting to each Plaintiff such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, each Plaintiff demands a jury

trial of all issues triable by jury.

Dated: September 25, 2009

Respectfully submitted,

Joseph T. Lukens
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
Tel.: (215) 496-7031
Fax: (215) 568-0300
Counsel for Plaintiffs

Of Counsel:

KENNY NACHWALTER, P.A.
Richard Alan Arnold
William J. Blechman
Scott E. Perwin
Douglas H. Patton
James T. Almon
201 S. Biscayne Boulevard
Suite 1100
Miami, Florida 33131
Tel:    (305) 373-1000
Fax:    (305) 372-1861
Email: rarnold@kennynachwalter.com
Email: wblechman@kennynachwalter.com
Email: sperwin@kennynachwalter.com
Email: dpatton@kennynachwalter.com
Email: jalmon@kennynachwalter.com